Slip Op. 17-143

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SOLARWORLD AMERICAS, INC. ET AL.,** | |
| **Plaintiff and Consolidated Plaintiffs,** | |
| **and** | |
| **CANADIAN SOLAR INC. ET AL.,** | |
| **Plaintiff-Intervenors and Consolidated Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Consol. Court No. 16-00134** |
| **UNITED STATES,** | **PUBLIC VERSION** |
| **Defendant,** | |
| **and** | |
| **CHANGZHOU TRINA SOLAR ENERGY CO., LTD. ET AL.,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenor.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the second administrative review of the antidumping duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Dated: October 18, 2017

Timothy C. Brightbill, Wiley Rein, LLP, of Washington, DC, argued for SolarWorld Americas, Inc. With him on the brief was Laura El-Sabaawi.

Robert George Gosselink, Trade Pacific, PLLC, of Washington, DC, argued for Changzhou Trina Solar Energy Co., Ltd.; Trina Solar (Changzhou) Science & Technology Co., Ltd.; Trina Solar (U.S.) Inc.; Yancheng Trina Solar Energy Technology Co., Ltd.; Changzhou Trina Solar Yabang Energy Co., Ltd.; Turpan Trina Solar Energy Co., Ltd.; and Hubei Trina Solar Energy Co., Ltd.  With him on the brief was Jonathan Michael Freed.

Neil R. Ellis, Sidley Austin, LLP, of Washington, DC, argued for Yingli Green Energy Holding Co., Ltd.; Yingli Green Energy Americas, Inc.; Yingli Energy (China) Co., Ltd.; Baoding Tianwei Yingli New Energy Resources Co., Ltd.; Beijing Tianneng Yingli New Energy Resources Co., Ltd.; Tianjin Yingli New Energy Resources Co., Ltd.; Hengshui Yingli New Energy Resources Co., Ltd.; Lixian Yingli New Energy Resources Co., Ltd.; Baoding Jiasheng Photovoltaic Technology Co., Ltd.; Hainan Yingli New Energy Resources Co., Ltd.; and Shenzhen Yingli New Energy Resources Co., Ltd.  With him on the brief were Richard L.A. Weiner, Shawn Michael Higgins, and Justin Ross Becker.

Neil R. Ellis, Richard L.A. Weiner, Shawn Michael Higgins, and Justin Ross Becker, Sidley Austin, LLP, of Washington, DC, for Canadian Solar Inc.; Canadian Solar (USA) Inc.; Canadian Solar Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; and Canadian Solar International Limited.

Craig Anderson Lewis, Hogan Lovells US LLP, of Washington, DC, for BYD (Shangluo) Industrial Co., Ltd. and Shanghai BYD Co., Ltd.

Tara Kathleen Hogan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of Counsel on the brief was Mercedes C. Morno, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Kelly, Judge:  Before the court for review is the U.S. Department of Commerce's ("Department" or "Commerce") determination in the second administrative review of the antidumping duty ("ADD") order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China ("China" or "the PRC").

See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC], 81 Fed. Reg. 39,905 (Dep't Commerce Jun. 20, 2016) (final results of ADD

administrative review and final determination of no shipments; 2013–2014) ("Final Results") and accompanying Decision Mem. for the Final Results of the 2013–2014 [ADD] Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the [PRC], A-570-979, (Jun. 13, 2016), ECF No. 21-5 ("Final Decision Memo").

For the reasons that follow, the court sustains Commerce's surrogate value selections for valuing respondents' aluminum frames, semi-finished polysilicon ingots and blocks, solar backsheet, and nitrogen inputs.  The court also sustains Commerce's selection of financial statements for calculating financial ratios for respondents' overhead, selling, general, and administrative ("SG&A") expenses, and profit, and Commerce's application of adverse facts available ("AFA") to respondent's unreported, purchased solar cells.  The court remands for further explanation or reconsideration consistent with this opinion Commerce's surrogate value selection for valuing respondents' tempered glass and scrapped solar cells and modules inputs, as well as Commerce's determination to include import data with reported quantities of zero in the surrogate value calculations.

## BACKGROUND

On February 4, 2015, Commerce initiated the second administrative review of the ADD order on crystalline silicon photovoltaic cells, whether or not assembled into modules, from China.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 80 Fed. Reg. 6,041, 6,042–44 (Dep't Commerce Feb. 4, 2015). Commerce subsequently selected Changzhou Trina Solar Energy Co., Ltd. ("Trina") and Yingli Green Energy Holding Co., Ltd. ("Yingli") as mandatory respondents in this review.

See Decision Mem. for Prelim. Results of the 2013–2014 [ADD] Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the [PRC], A-570-979, at 2, PD 520, bar code 3427351-01 (Dec. 18, 2015) ("Prelim. Decision Memo") (citing 2013–2014 [ADD] Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the [PRC]: Respondent Selection, A-570-979, at 4–5, PD 67, bar code 3264380-01 (Mar. 13, 2015)).[1]   On December 28, 2015, Commerce published the preliminary determination. See Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, from the [PRC], 80 Fed. Reg. 80,746 (Dep't Commerce Dec. 28, 2015) (preliminary results of [ADD] administrative review and preliminary determination of no shipments; 2013–2014), and accompanying Prelim. Decision Memo.

On June 13, 2016, Commerce published the final determination.   See Final Results, 81 Fed. Reg. at 39,905.   Commerce valued Yingli's tempered glass input, respondents' scrapped cells and modules input, respondents' aluminum frame inputs, respondents' backsheet inputs, and Trina's nitrogen input using Thai import data. See Final Decision Memo at 20–27, 29–34, 40–43, 46–48, 60–63.   Commerce valued respondents' semi-finished polysilicon ingot and block inputs using the world-market price for solar-grade polysilicon.   See id. at 38–39.   Commerce included in the average unit surrogate value calculations import data with reported quantities of zero, finding "no basis

---

[1] On September 14, 2016, Defendant submitted indices to the public and confidential administrative records for this review.  These indices are located on the docket at ECF No. 21. All further references to documents from the administrative records are identified by the numbers assigned by Commerce in these indices.

in the record to conclude that these entries are unreliable or incorrect because they list

zero for the quantity." Id. at 64. Commerce selected the financial statements of Thai

company Styromatic (Thailand) Co., Ltd. ("Styromatic") to calculate respondents'

overhead, SG&A expenses and profit. See id. at 35–38. Finally, Commerce applied AFA

to value Trina's unreported factors of production ("FOPs") using Trina's highest

consumption rates for FOPs for solar cells sold in the United States. See id. at 50–57.

Commerce did not apply AFA to Yingli's unreported FOPs for purchased solar cells. See

id. at 52.

Plaintiff, SolarWorld Americas, Inc. ("SolarWorld"), commenced this action

pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C.

§ 1516a(a)(2)(B)(iii) (2012).[2] See Summons, July 20, 2016, ECF No. 1. SolarWorld

moved for judgment on the agency record, challenging five aspects of the final

determination. See SolarWorld's Mot. J. Agency R., Jan. 26, 2017, ECF No. 44;

SolarWorld Americas, Inc.'s Mem. Supp. Rule 56.2 Mot. J. Agency R. Conf. Version, Jan.

26, 2017, ECF No. 44 ("SolarWorld Br."). Specifically, SolarWorld challenges

Commerce's: 1) determination to use Harmonized Tariff Schedule ("HTS") subheading

7604.29 to value respondents' aluminum frames; 2) determination to value respondents'

processed, semi-finished polysilicon ingots and blocks using the surrogate value for

unprocessed polysilicon; 3) valuation of respondents' solar module backsheets used in

the production of subject merchandise using Thai HTS subheadings 3920.62.00090 and

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19
of the U.S. Code, 2012 edition.

3920.62.00001; 4) determination to utilize Thai data for imports classified under HTS

subheading 8548.10 as a surrogate to value Trina's scrapped solar cells; and 5) selection

of the financial statements of Styromatic to calculate respondents' overhead, SG&A

expenses and profit.  See id. at 12–43.

This action was consolidated with actions filed by Trina et al.[3] and Yingli et al.[4]

See Order, Oct. 25, 2016, ECF No. 31.  Consolidated Plaintiffs filed motions for judgment

on the agency record, Pls.' Rule 56.2 Mot. J. Agency R., Jan. 25, 2017, ECF No. 40; Mot.

J. Agency R., Jan. 25, 2017, ECF No. 39, each challenging different aspects of

Commerce's final determination in this review.   See Mem. Supp. Mot. [Trina et al.] J.

Agency R. Conf. Version, Jan. 25, 2017, ECF No. 40 ("Trina Br."); Mem. Points and

Authorities Supp. Mot. J. Agency R. Conf. Version, Jan. 25, 2017, ECF No. 39 ("Yingli

Br.").  Specifically, Trina challenges: 1) Commerce's selection of a surrogate value for its

nitrogen gas input based upon Thai import data; 2) Commerce's inclusion, in the

calculation of surrogate values, values for Thai import categories with reported quantities

---

[3] The following parties are plaintiffs in the action Changzhou Trina Solar Energy Co., Ltd. v. United States, Ct. No. 16-00132, which has been consolidated with the present action: Changzhou Trina Solar Energy Co., Ltd.; Trina Solar (Changzhou) Science and Technology Co., Ltd.; Yancheng Trina Solar Energy Technology Co., Ltd.; Changzhou Trina Solar Yabang Energy Co., Ltd.; Turpan Trina Solar Energy Co., Ltd.; and Hubei Trina Solar Energy Co., Ltd.

[4] The following parties are plaintiffs in the action Yingli Green Energy Holding Co., Ltd. v. United States, Ct. No. 16-00135, which has been consolidated with the present action: Yingli Green Energy Holding Company Limited; Yingli Green Energy Americas, Inc.; Yingli Energy (China) Co., Ltd.; Baoding Tianwei Yingli New Energy Resources Co., Ltd.; Tianjin Yingli New Energy Resources Co., Ltd.; Hengshui Yingli New Energy Resources Co., Ltd.; Lixian Yingli New Energy Resources Co., Ltd.; Baoding Jiasheng Photovoltaic Technology Co., Ltd.; Beijing Tianneng Yingli New Energy Resources Co., Ltd.; Hainan Yingli New Energy Resources Co., Ltd.; and Shenzhen Yingli New Energy Resources Co., Ltd.

of zero; and 3) Commerce's application of AFA to value Trina's unreported, purchased solar cells.  <u>See</u> Trina Br. 7–24.  Yingli challenges Commerce's use of Thai import data to value Yingli's tempered glass input, contending that the Thai data is aberrational.  <u>See</u> Yingli Br. 9–26.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping duty order.  "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

Plaintiff and Consolidated Plaintiffs challenge a total of six surrogate value determinations Commerce made in the final results of this review, and raise three additional challenges.  The court first addresses the arguments that Commerce's surrogate value selection for tempered glass, aluminum frames, scrapped solar cells and modules, semi-finished polysilicon ingots and blocks, solar backsheet, and nitrogen are unsupported by substantial evidence.  The court then addresses the arguments regarding the inclusion of import data with reported quantities of zero, the use of certain financial statements for calculating financial ratios, and, finally, the application of AFA to Trina's unreported, purchased solar cells.

## I. Surrogate Value Selection

Plaintiff and Consolidated Plaintiffs challenge Commerce's surrogate value selection for tempered glass, aluminum frames, scrapped solar cells and modules, semi-finished polysilicon ingots and blocks, solar backsheet, and nitrogen as unsupported by substantial evidence. The court addresses each of these challenges in turn.

### A. Tempered Glass

In this review, Commerce valued Yingli's tempered glass with Thai import data for HTS category 7007.19.90. See Final Decision Memo at 29–34. Yingli argues that the Thai import data did not constitute the best available information for valuing the tempered glass because the Thai data is distorted by aberrational imports from Hong Kong.[5] See Yingli Br. 20–24. Yingli also argues that Commerce erred in concluding that the Thai import data was not aberrational because two of Commerce's benchmarks—values from Ecuador and the Ukraine—were not credible since the quantity of tempered glass imports into these two countries was significantly lower than for other economically comparable countries with data on the record.[6] See id. at 10–20. Defendant contends that Commerce

---

[5] Yingli suggests that Commerce calculate the surrogate value using the Thai import data from the period of review ("POR"), excluding the Hong Kong data (USD $1.00 per kg), or instead use the world market price (USD $0.51 per kg), the Bulgarian value for the POR (USD $0.77 per kg), the Thai value from the first administrative review, adjusted for inflation (USD $0.87 per kg), price quotes obtained for tempered glass (USD $0.94 per kg), or an average of two or more of any of these alternatives. See id. at 22–26.

[6] Specifically, Yingli argues that it was unreasonable for Commerce to use import data from Ecuador and the Ukraine as benchmarks because the quantity of imports of tempered glass into both countries was significantly lower than the quantities of imports in the other countries found to be economically comparable with China and the quantity of tempered glass purchased by Yingli during the POR. Yingli argues that these low quantities render the data from Ecuador and the Ukraine not credible. See Yingli Br. 10–17.

reasonably concluded that the Thai import data was not aberrational and reasonably used the Thai data to value the tempered glass input.  See Def.'s Resp. Mots. J. Upon Admin. R. 10–16, Apr. 25, 2017, ECF No. 55 ("Def.'s Resp.").  For the reasons that follow, this issue is remanded to Commerce to reconsider or further explain its determination to use Thai import data to value Yingli's tempered glass.

In cases involving imports from a nonmarket economy ("NME") country,[7] Commerce obtains a normal value by adding the value of the factors of production used to produce the subject merchandise and "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  19 U.S.C. § 1677b(c)(1). Commerce selects a surrogate value by which it values the FOPs, and makes that selection "based on the best available information regarding the values of such factors in a market economy country or countries."  Id.  Commerce's methodology for selecting the best available information evaluates data sources based upon their: (1) specificity to the input; (2) tax and import duty exclusivity; (3) contemporaneity with the period of review; (4) representativeness of a broad market average; and (5) public availability.  See Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited Oct. 13, 2017) ("Policy

---

[7] The term "nonmarket economy country" means any foreign country that Commerce determines "does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A).  In such cases, Commerce must "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . [together with other costs and expenses]."  Id. § 1677b(c)(1).

Bulletin 04.1").  To the extent possible, Commerce uses "the prices or costs of factors of production in one or more market economy countries that are-- (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  19 U.S.C. §§ 1677b(c)(4)(A)–(B).  Commerce also has a regulatory preference for valuing all factors of production using surrogate value data from a single surrogate country where practicable.  19 C.F.R. § 351.408(c)(2) (2015).[8]  Although Commerce has broad discretion in deciding what constitutes the best available information, see QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (noting the absence of a definition for "best available information" in the ADD statute), it must ground its selection of the best available information in the overall purpose of the statute, which is to calculate accurate dumping margins.  See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990); see also Parkdale Int'l. v. United States, 475 F.3d 1375, 1380 (Fed. Cir. 2007).

It is Commerce's practice not to use aberrational values as surrogate values. Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997).  Commerce considers import data aberrationally high if the data is "many times higher than the import values from other countries."  Final Decision Memo at 33.  Commerce's practice also excludes unit values within import data when those values themselves are aberrational and distort the import data.  See Final Results of Redetermination Pursuant to Catfish Farmers of America v. United States, Consol.

---

[8] Further citations to Title 19 of the Code of Federal Regulations are to the 2015 edition.

**PUBLIC VERSION**

Court No. 08-00111, at 4–7, (Sept. 14, 2009), ECF No. 100-1 ("<u>Catfish Farmers Remand Results</u>"); Issues and Decision Mem. for the Investigation of Steel Wire Rope from the [PRC], A-570-859, at Comment 1, (Feb. 28, 2001), <u>available at</u> http://ia.ita.doc.gov/frn/summary/prc/01-4895-1.txt (last visited Oct. 13, 2017) ("<u>Steel Wire Rope from the PRC</u>").

Here, Commerce valued Trina's tempered glass input using Thai import data. Final Decision Memo at 31. Commerce explained that, pursuant to its practice for investigating claims of aberrational data, it compared the average unit value ("AUV") of the Thai data for the period of review ("POR") to contemporaneous data on the record for potential surrogate countries and also to historical Thai import data on the record. <u>Id.</u> at 31–33. Commerce determined that the Thai import data from the POR does not appear aberrational according to "the standards typically relied on by the Department," because the Thai value was "within the range of AUVs of other economically comparable surrogate countries" and as compared to the historical Thai data for tempered glass. <u>Id.</u> at 33–34. Yingli argues that Commerce unreasonably used data from Ecuador and Ukraine as benchmarks, which were not credible because those countries' imports of tempered glass were of low quantity relative to the imports from the other economically comparable countries and to the quantity of tempered glass purchased by Yingli. Yingli Br. 15–16. Commerce stated that low quantity data does not necessarily indicate aberration and there is no indication that the data from either Ecuador or Ukraine is aberrational. Final Decision Memo at 32–33.

Yingli also argues that the Thai surrogate value is distorted by low-quantity, high-value imports from Hong Kong (with an average value of $191.47 per kilogram, compared to an average value of imports from all other countries of $1.00 per kilogram).  See Yingli Br. 20–24.  Commerce stated that the quantity of Thai imports from Hong Kong was not low because Hong Kong was the fourth largest importer of tempered glass into Thailand during the POR.  Final Decision Memo at 33.  Commerce also stated that the unit value for the Hong Kong imports "is [not] substantially different from per-unit values of the Netherlands ($210 per kg) and the United States ($300 per kg)."  Id.

Although Commerce has broad discretion to determine what constitutes the best available information with which to value each FOP, see QVD Food Co., 658 F.3d at 1323, here Commerce did not explain why its selection is reasonable, in light of the evidence that the Hong Kong data, which makes up 1.6% of the total volume, accounts for more than 75% of the total value.  See Yingli Br. 22–23.  Commerce supported its determination that the Thai import value is not aberrational by relying upon prior practice, including Steel Wire Rope from PRC and Catfish Farmers Remand Results.[9]  See Final Decision Memo at 33 (citing Steel Wire Rope from PRC at Comment 1; Catfish Farmers Remand Results at 4–7).  Specifically, Commerce invokes these cases to demonstrate that the agency has previously determined import values to be aberrational "if they [were] many times higher than the import values from other countries," or if they "varied between

---

[9] Defendant in its response brief also states that Catfish Farmers Remand Results supports Commerce's determination here, noting that, in Catfish Farmers Remand Results, the agency "found the surrogate values for labels to be aberrational when the AUVs varied between 30 and 79 times greater than the average of other import data."  Def.'s Resp. 14.

30 and 79 times greater than the average of the rest of the import data." Final Decision Memo at 33. Yet the very examples cited by Commerce are ones in which the agency chose to extract unit values from within the import value, where unit value distorted the import value.[10] In Steel Wire Rope from PRC, Commerce excluded Malaysian unit values from the selected import value for wire rod, because the Malaysian unit values were "many times higher than the import values from other countries, and are not in line with numerous other prices for wire rod on the record."[11] Steel Wire Rope from PRC at Comment 1. In Catfish Farmers Remand Results, Commerce excluded unit values from Japan and the Netherlands from the import value used as surrogate value for respondent's labels because the unit value from the Netherlands and Japan were more than 79 and 30 times greater respectively, than the overall average import values.[12] See Catfish Farmers Remand Results at 5–6.

---

[10] Commerce also cites a case in which the agency did not exclude certain unit values from within the surrogate value. See Final Decision Memo at 33. Commerce's explanation for not excluding those inputs in that case suggests that the agency would exclude certain inputs if a party "provide[s] specific evidence and analysis to support their position that selected country-specific unit values in the [surrogate value] data are aberrational." Issues and Decision Mem. for the 2006–2007 Admin. Review of Certain Cased Pencils from the [PRC], A-570-827, at 50, (July 6, 2009), available at http://ia.ita.doc.gov/frn/summary/prc/E9-16511-1.pdf (last visited Oct. 13, 2017).

[11] In Steel Wire Rope from the PRC, Commerce also referenced prior agency practice to exclude, "where appropriate - aberrational data that appear to distort the overall value for a specific import category." Steel Wire Rope from the PRC at Comment 1 (citing Chrome-Plated Lug Nuts From The [PRC], 63 Fed. Reg. 53,872, 53,873 (Dep't Commerce Oct. 7, 1998) (final results of ADD administrative review) (excluding German unit value from Indian import data when calculating surrogate value, because the German unit value was "many times higher than" the values of other unit values within the Indian import data.).

[12] Commerce also noted that these significantly higher values were each based on a volume significantly smaller than that of other volumes on the record. See Catfish Farmers Remand Results at 6.

Commerce cites these cases for the proposition that an import value must be a multiple of other import values to be aberrational.  However, at issue in these cases—as in the present case—was whether a unit value should be excluded from the import value (ultimately chosen as a surrogate value) because the unit value itself is a multiple of the other unit values.  See Steel Wire Rope from PRC at Comment 1; Catfish Farmers Remand Results at 4–7.  The cases invoked by Commerce to support its determination seem to demonstrate a practice that would support excluding from the import value any aberrational inputs within that value, and Commerce has not explained why that apparent practice should not be followed in this case.  Here, Yingli points to record evidence indicating that the Hong Kong unit values within the Thai import data are over 191 times greater than the average unit values from the remaining countries with data on the record,[13] see Yingli Br. 22–23, which undermines the reasonableness of the selection of the Thai data.[14]  The Hong Kong import data, which constitutes 1.6% of the total volume of Thai import data, raises the Thai surrogate value from $1.00 USD to $4.14 USD.  As the cases invoked by Commerce suggest an agency practice according to which

---

[13] SolarWorld refutes Yingli's claim that the Hong Kong imports were of non-commercial quantity. SolarWorld Resp. 15; Yingli Br. 22.  Regardless of whether the quantity was commercial, the basis of Yingli's claim is that a relatively small proportion of the overall import data had a disproportionately large effect on the Thai import value, which suggests that the Thai import value is not reliable.

[14] To clarify, the Hong Kong values are from import data that form a part of the overall Thai value. The Thai value, at $4.14 per kg, is not the highest value on the record.  The Ukraine value is $5.89 per kg (for comparison, the Ecuador value is $2.75 per kg and the Bulgarian value is $0.77 per kg).  Yingli argues that the Hong Kong import values skew the Thai value unreasonably, as without the Hong Kong imports the Thai value would decrease from $4.14 to $1.00 per kg.  See Yingli Br. 23.  At the same time, Yingli claims that the values from Ecuador and Ukraine are not credible benchmarks. See id. at 14–17.

Commerce would exclude these input values, Commerce must explain why its diversion from such a practice here is reasonable.  In light of Commerce's practice as explained in Catfish Farmers Remand Results and Steel Wire Rope from the PRC, this disproportionate impact of the Hong Kong values, and the claim that the benchmark values from Ecuador and the Ukraine are themselves unreliable,[15] see Yingli Br. 10–18, Commerce must explain why its choice is reasonable or reconsider its determination.

### B. Aluminum Frames

SolarWorld challenges Commerce's valuation of the respondents' aluminum frames using Thai HTS subheading 7604.29, covering "Aluminum bars, rods and profiles: Of aluminum alloys: Other," contending that the import data under this category does not reflect the value of the frames.[16]  See SolarWorld Br. 13–23.  SolarWorld emphasizes that the frames "have been further manufactured into a finished and final form," id. at 17,

---

[15] The basis of Yingli's claim that Ecuador and Ukraine are not credible benchmarks is the low quantity of tempered glass imports into those two countries:

> the quantities of imports of tempered glass in Ecuador and Ukraine are significantly lower than both the quantities of imports in the other countries found to be comparable with China and the quantity of tempered glass purchased by Yingli during the POR. For example, . . . the average quantity of tempered glass imported by Thailand and Bulgaria during the periods for which data are available was over 8,682% greater than the quantity imported by Ecuador during the POR and over 1,177% greater than the quantity imported by Ukraine during the POR. Even more significant – and completely overlooked by the Department in the Final Results – is the fact that during the POR, Yingli itself purchased [[                    ]] kg of tempered glass, which was over [[          ]]% and [[          ]]% greater than the tiny quantities imported by Ecuador and Ukraine, respectively, during the same time period.

Yingli Br. 15–16 (footnotes omitted).

[16] In particular, SolarWorld alleges that the [[

                                                    ]] is not reflected in the import data for Thai HTS subheading 7604.29.  See SolarWorld Br. 13–21.

such that valuation using data from HTS subheading 7604.29 is inappropriate because

HTS subheading 7604.29 is specific to unfinished aluminum products.  Id. at 20–21.

Defendant responds that Commerce reasonably concluded that import data under HTS

subheading 7604.29 is the best available information to value the frames because it is

the category most specific to respondents' frames, which the respondents described as

"non-hollow, aluminum profiles."   See Def.'s Resp. 16.   For the reasons that follow,

Commerce's selection of import data under HTS subheading 7604.29 is supported by

substantial evidence.

As discussed above, Commerce is required to select a surrogate value for each

FOP using "the best available information."  19 U.S.C. § 1677b(c)(1).  As the term "best

available information" is not statutorily defined, Commerce has broad discretion in

deciding what constitutes the best available information, see QVD Food Co., 658 F.3d at

1323, but the agency must make a selection that will enable it to ultimately calculate

accurate dumping margins.  See Rhone Poulenc, Inc., 899 F.2d at 1191.  Commerce

considers the best available information to be publically available data that is specific to

the input, tax and import duty exclusive, contemporaneous with the period of review, and

representative of a broad market average.  See Policy Bulletin 04.1.

Here, Commerce concluded that import data under HTS subheading 7604.29

constituted the best available information to value respondents' aluminum frames.  See

Final Decision Memo at 23–27.  Commerce emphasized that both respondents described

their frames as "non-hollow, aluminum profiles," that this description has not been

challenged, and that Commerce has not found anything in the record to contradict this

description. Id. at 23–24.  Commerce concluded that the category is a better fit than the

alternatives on the record, as it is more specific than import data under SolarWorld's

proposed HTS subheading 7616, an "other" category which includes articles dissimilar to

aluminum frames such as "nails, tacks, staples, screws, bolts, nuts, screw hooks, rivets,

cotters, cotter pins, washers, knitting needles, bodkins, crochet hooks, embroidery

stilettos, safety pins, other pins and chains, and cloth, grill and netting of aluminum wire."

Id. at 26 (internal quotations omitted).   In light of these explanations, Commerce

reasonably determined that import data under HTS heading 7604 is more specific than

the other available alternatives on the record and that HTS heading 7604 accordingly

constituted the best available information.

SolarWorld's claim that specific evidence in this review renders the selection of

HTS subheading 7604.29 unreasonable, see SolarWorld Br. 17–22, is unavailing.

Specifically, SolarWorld highlights evidence that it contends demonstrates that certain of

Yingli's frames have been processed to include additional "features and adaptations"

beyond those present in "simple aluminum extrusions," and other evidence that it

contends demonstrates that certain solar frames have been classified within HTS

category 7616.[17]  Id. at 17, 19.  Commerce emphasized that HTS category 7604 does

not necessarily cover only unfinished aluminum profiles, making the degree of finishing

---

[17] Specifically, SolarWorld argues that certain of Yingli's frames are further processed to be compliant with the [[                                    ]], which it contends requires certain "features and adaptations . . . not found in a simple aluminum extrusion."  SolarWorld Br. 17.  SolarWorld also highlights evidence obtained from [[
        ]], demonstrating that solar frames were classified within HTS category [[      ]] in [[      ]] entries of aluminum frames.  Id. at 19.

the frames have undergone not relevant to a determination that HTS category 7604 is the

best available information for valuing respondents' frames.  Final Decision Memo at 24.

Commerce highlighted the HTS Chapter 76 notes, which indicate that profiles include

products that "'have been <u>subsequently worked after production</u> . . . provided that they

have not thereby assumed the character of articles or products of the other headings.'"

<u>Id.</u> at 25 (emphasis in original, quoting <u>Jiangsu Jiasheng Photovoltaic Technology, Co. v.

United States</u>, 38 CIT __, __, 28 F.Supp.3d 1317, 1337 (2014)).   Commerce also

references the International Trade Commission's definition of aluminum profiles, defining

profiles as "cast sintered, and worked after production."  <u>Id.</u>  It is reasonably discernible

that Commerce concluded that the additional processing highlighted by SolarWorld is not

sufficient to make the profiles more similar to the articles enumerated in a different

subheading.   <u>See</u> <u>id.</u>  SolarWorld points to no evidence detracting from Commerce's

determination.[18]

SolarWorld also argues that Commerce unreasonably concluded that Yingli's

aluminum frames were "profiles" because profiles must have a uniform cross section.

SolarWorld Br. 22 (citing the Notes to Chapter 76 of the HTS).  SolarWorld suggests that

the respondents' profiles are not uniform along their entire length.  <u>Id.</u>  In response to this

argument, Commerce indicated its position that the presence of corners in some of the

frames "would [not] necessarily change their classification as aluminum profiles."   Final

---

[18] Commerce also concluded that the Customs and Border Protection rulings placed on the record do not undermine its determination that HTS heading 7604 represents the best available information for valuing the aluminum frames.  <u>See</u> Final Decision Memo at 25–26.

Decision Memo at 25.  Further, Commerce's task is not to classify the solar frame inputs

for customs purposes, but to select the best available data to value the FOPs in question.

See 19 U.S.C. § 1677b(c)(1).  SolarWorld offers no evidence that calls into question

Commerce's conclusion that the frames are more similar to the unfinished items included

in HTS heading 7604 than any other HTS category on the record of this review.

Therefore, Commerce's determination is supported by substantial evidence.

### C.  Scrapped Solar Cells and Modules

SolarWorld challenges Commerce's valuation of Trina's broken and scrapped

polysilicon cells and modules using HTS category 8548.10, claiming that HTS category

8548.10 is specific to scrapped battery products rather than scrapped solar products and

that the surrogate value is unrepresentative as it is more than double the surrogate value

for the primary material input, raw polysilicon.[19]  See SolarWorld Br. 32–36.  Defendant

responds that Commerce's determination is supported by substantial evidence, because

---

[19] SolarWorld does not challenge Commerce's valuation of Yingli's scrapped solar cells and modules.  In the final determination, Commerce valued Yingli's scrapped solar cells and modules using Thai import data classified under HTS subheading 2804.69, covering imports of polysilicon containing less than 99.99 percent purity.  Final Decision Memo at 47.  SolarWorld argues that Commerce should value Trina's scrapped solar cells and modules using Thai import data from HTS subheading 2804.69 as well.  See SolarWorld Br. 32–36.  Commerce emphasizes that the cells were valued differently because the two respondents reported the process by which the scrap by-product is generated, with Trina reporting its scrap by-product as broken cells and modules and Yingli reporting its by-product as polysilicon removed from the broken cells and modules.  See Final Decision Memo at 47.  SolarWorld argues that "the alleged distinction between Trina's and Yingli's cell scrap provides no support for Commerce's valuation of Trina's scrap under HTS 8548" because category HTS 8548 "has nothing at all to do with photovoltaic products, whether or not the scrap consists of portions of an entire solar cell."  Reply Br. Pl. SolarWorld Americas, Inc. 17, Jun. 5, 2017, ECF No. 73.  Although SolarWorld argues that Trina's scrap should be valued using the subheading with which Yingli's scrap is valued, SolarWorld does not argue that Commerce acted arbitrarily by treating similarly situated respondents differently.

Trina's questionnaire responses indicated that the scrap cells and modules are comprised of "every component of the cell and not simply polysilicon," and that these other components add value, such that the selection of an HTS category specific to polysilicon would not be representative.  See Def.'s Resp. 22–24.  For the reasons that follow, this issue is remanded to Commerce.

As discussed, pursuant to the statute, Commerce uses the best available information to select a surrogate value for each FOP.   19 U.S.C. § 1677b(c)(1).  Commerce seeks a data source that is publically available, specific to the input, tax and import duty exclusive, contemporaneous with the period of review, and representative of a broad market average.   See Policy Bulletin 04.1.   In this review, Trina reported generating cell and module scrap in the cell and module production stages of subject merchandise production.  See Trina Section D Questionnaire and Appendices Response at D-22–23, CD 153–161, bar codes 3276429-01–10 (May 14, 2015).  Trina reported that the broken cells and modules are sold rather than reintroduced into production, and accordingly claimed by-product offsets to normal value for the scrapped cells and modules.  Id. at D-22.  Commerce sought representative surrogate data by which to value the scrap generated and sold with which to offset Trina's normal value.  See Final Decision Memo at 47–48.  Commerce determined that subheading 8548.10, HTS, is "more similar to the characteristics of Trina's scrapped and broken solar cells than the description of the alternative [surrogate values] on the record."  Id. at 48.

Commerce failed to address SolarWorld's argument that the language of heading 8548, HTS, evidences that the products imported under that heading are specific to

electrical batteries and "are produced using a significantly different manufacturing process with completely different raw material inputs than are solar cells." SolarWorld Br. 33. Commerce noted that it found 8548.10 to be the appropriate category for valuing Trina's cells because Trina reported that the cell and module scrap was composed of every aspect of the cell, not just the raw primary silicon, and because the cells and modules are "apparatus used to generate electricity, like a battery . . ." Final Decision Memo at 47. However, Commerce did not explain why the selection of HTS category 8548.10 is reasonable given that the category is not specific to solar cells and given the concern raised by SolarWorld, regarding selecting a surrogate value for a byproduct that is higher than the value for the input itself. See SolarWorld Br. 34–35. Further, Commerce's rationale for rejecting HTS subheading 2804.69, for raw polysilicon of less than 99% purity, undercuts Commerce's selection of HTS category 8548.10. See Final Decision Memo at 47–48. Commerce claims HTS subheading 2804.69 "pertains specifically to silicon, which is only one component of solar cells and modules waste," id. at 47, yet category 8548.10 is not specific to any of the materials in the scrapped cell. See Subheading 8548.10, HTS ("Waste and scrap of primary cells, primary batteries and electric storage batteries; spent primary cells, spent primary batteries and spent electric storage batteries"). Although Commerce has considerable discretion in selecting the appropriate data to calculate surrogate values, see Fujitsu General Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (granting Commerce significant deference in determinations "involv[ing] complex economic and accounting decisions of a technical nature"), Commerce "must cogently explain why it has exercised its discretion in a given

manner." Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S.

29, 48–49 (1983).   Because Commerce did not address SolarWorld's arguments, the

agency has failed to adequately explain how its decision is reasonable in light of the

record as a whole, including the evidence that reasonably detracts from its conclusion.

Universal Camera Corp. v. NLRB, 350 U.S. 474, 488 (1951) ("The substantiality of

evidence must take into account whatever in the record fairly detracts from its weight.").

On remand Commerce must explain or reconsider its determination to value the scrapped

cells and modules using import data for HTS category 8548.10.

### D.  Semi-Finished Polysilicon Ingots and Blocks

SolarWorld challenges Commerce's determination to value respondents' semi-

finished polysilicon ingots and blocks using the world market price for raw polysilicon,

claiming the surrogate value does not reflect the substantial additional processing and

value added turning raw polysilicon into an ingot or block.[20]   SolarWorld Br. 23–27.

SolarWorld proposes that Commerce instead construct a cost, starting with the world-

market price of raw polysilicon and adding the costs of the further processing and

materials. Id. at 25–26.  Defendant responds that, given the available data on the record,

Commerce reasonably chose to value respondents' ingots and blocks using a surrogate

for the primary raw input.   See Def.'s Resp. 24–26.   For the reasons that follow,

---

[20] SolarWorld points to [[

                    ]]. SolarWorld Br. 23–24.

Commerce's determination to value respondents' semi-finished polysilicon ingots and blocks with the world market price for raw polysilicon is reasonable and is sustained.

Here, Commerce determined that the world market price for raw polysilicon constitutes the best available information for valuing respondents' semi-finished polysilicon ingots and blocks. Final Decision Memo at 38–39. In the absence of data values for ingots and blocks, Commerce used a value for raw polysilicon because respondents' ingots and blocks are primarily composed of polysilicon. Id. Commerce determined that no reliable record evidence suggests that the world market price for polysilicon would result in unrepresentative pricing for ingots and blocks, and emphasized that at least some of the additional processing required to turn raw polysilicon into ingots and blocks is accounted for in the manufacturing costs, included elsewhere in the calculations. Id. at 39. From Commerce's emphasis on using a value for the main component, it is reasonably discernible that Commerce recognized that this option is imperfect, but that it would result in a more accurate surrogate value than would a value for a component that is not the main component. See Rhone Poulenc, Inc., 899 F.2d at 1191. It is also reasonably discernible that Commerce determined, consistent with its practice, that the world market price for raw polysilicon is as specific as possible to the input (lacking data for the input itself), is contemporaneous, publically available, and represents a broad market average. See Final Decision Memo at 39; Policy Bulletin 04.1. The determination that this value constitutes the best available information is reasonable.

SolarWorld contends that additional materials are consumed in the processing that are not represented in the surrogate value for the raw material. See SolarWorld Br. 25;

Reply Br. Pl. SolarWorld Americas, Inc. 10–11, Jun. 5, 2017, ECF No. 73.  Commerce

noted that the agency "do[es] not believe there is sufficient evidence to demonstrate that

the processing and additional inputs used at the ingot, and block production stages adds

significant value beyond the original cost of the polysilicon."  Final Decision Memo at 39.

SolarWorld's claim that not all costs are represented does not undermine Commerce's

conclusion that the agency accounted for processing costs required to manufacture the

ingots and blocks for most merchandise, and that the surrogate value for the primary input

constituted the best available information.  Although SolarWorld claims that the record

contained information to allow Commerce to add processing costs onto the value of

polysilicon to build up a price for these inputs, see SolarWorld Br. 23–24, 27, the

availability of another methodology does not make Commerce's determination

unreasonable given the record evidence.   Commerce's determination to value

respondents' polysilicon ingots and blocks using the world-market price for raw polysilicon

is therefore supported by substantial evidence.

### E.  Surrogate Value for Backsheets

SolarWorld argues that, in valuing Yingli's solar backsheet input using Thai HTS

category 3920.62 and Trina's solar backsheet input using Thai HTS category 3920.10,

Commerce unreasonably undervalued the respondents' backsheets. See SolarWorld Br.

27–32. SolarWorld contends that respondents' solar backsheets are "a highly technical

and particularized set of goods," id. at 28, and that import data for HTS categories 3920.10

and 3920.62, each of which covers only one type of plastic, fails to reflect the complex

nature of the backsheets, resulting in an unrepresentative surrogate value.  Id. at 28, 32.

Defendant contends that Commerce's use of HTS categories 3920.62 and 3920.10 was supported by substantial evidence because backsheets are "multilayered plastic sheets" and, lacking a surrogate value specifically for backsheets, it was reasonable for Commerce to value the backsheets using "the import value for the type of plastic sheet which most closely corresponds to respondents' backsheets."  Def.'s Resp. 27.  For the reasons that follow, Commerce's use of Thai import data for HTS categories 3920.10 and 3920.62 to value respondents' backsheets is supported by substantial evidence.

As discussed, Commerce uses the best available information to select a surrogate value for each FOP, pursuant to 19 U.S.C. § 1677b(c)(1).  Commerce seeks a data source that is publically available, specific to the input, tax and import duty exclusive, contemporaneous with the period of review, and representative of a broad market average.  See Policy Bulletin 04.1.  In the final determination, Commerce valued Yingli's backsheets using Thai HTS category 3920.62, covering plastic sheets of PET ("plates, sheets, film, foil and strip of plastics, not self-adhesive, non-cellular, not reinforced etc., of PET, other"), and valued Trina's backsheets using HTS category 3920.10, covering plastic sheets of EVA ("plates, sheets, film, foil and strip of plastics, not self-adhesive, non-cellular, not reinforced etc., of polymers of ethylene").  See Final Decision Memo at 41–43.  Commerce explained that each of these categories was selected because it corresponds to the primary material used in each respondent's backsheets.  Id. at 41–42.  Commerce determined that HTS category 3920.62, specific to PET, and HTS category 3920.10, specific to EVA, constitute the best available information for valuing respondents' backsheets because Yingli's backsheets consist primarily of PET and

Trina's backsheets consist primarily of EVA.  Id. at 41.  Addressing the argument that the

categories did not perfectly reflect the complex nature of the backsheets, Commerce

explained that:

> [b]ecause record evidence shows that Yingli and Trina bought whole
> backsheets, as opposed to assembling the various components
> themselves, we selected the best available information on the record for
> valuing backsheets, not for valuing the components of backsheets.
> However, there are no [surrogate values] on the record specifically for
> backsheets.  Backsheets are multilayered plastic sheets.  Thus, we
> determined that the best available information on the record for valuing
> backsheets is the import value for the type of plastic sheet which most
> closely corresponds to type of backsheets used by the respondents.

Id. at 42.  Commerce declined to value the backsheets using SolarWorld's proposed HTS

category 3920.99, for plastics not otherwise specified, finding that category less specific

than 3920.10 and 3920.62 because each of the latter categories covers the primary

material in each respondent's backsheets while category 3920.99 covers unspecified

plastics.  Id.

Commerce reasonably selected HTS categories 3920.10 and 3920.62,

respectively, to value Yingli's and Trina's backsheets.  Acknowledging that the HTS

categories were imperfect, Commerce explained that a perfect fit was not available.  Final

Decision Memo at 42.  Commerce explained that its selection of the categories was based

on the fact that the primary material in each respondent's backsheets was reflected in the

specific material of each category.  See id. at 41–42.  In the absence of a category

specifically for backsheets, it is reasonable to choose import data for plastic sheeting of

the type of specific plastic that constitutes the primary material in each respondent's

backsheets.  Commerce considered the proposed alternative HTS categories for valuing

the backsheets, including SolarWorld's proposed HTS category 3920.99, consisting of

plastics not elsewhere specified under HTS heading 3920, and explained why each did

not constitute a better selection than 3920.62 and 3920.10.  See id. at 42.

SolarWorld argues that substantial evidence does not support the selection of

these HTS categories because the surrogate value import data does not compare to the

actual market economy prices that respondents paid for their backsheets.  SolarWorld Br.

30–32.  SolarWorld argues that, where respondents' actual prices paid for an input are

available and there is no evidence that the prices are unrepresentative, "Commerce

should not ignore the actual price that the Chinese respondents paid for certain goods

when assessing the viability of a surrogate value."  Id. at 32.  However, Commerce

explained that it does not use the actual prices paid as benchmarks, due to its preference

for public information and because such prices may not be representative.[21]   Final

---

[21] Where a respondent sources an input both from market economy suppliers using a market economy currency and from NME suppliers, and where the volume of the input purchased from the market economy suppliers amounts to less than 85% of the total volume of the input purchased, Commerce calculates a value for the input by weight-averaging the market economy prices paid for the input and a surrogate value.  See 19 C.F.R. § 351.408(c)(1); Trina Prelim. Calculation Mem. at 2–3, CD 566, bar code 3427993-01 (Dec. 18, 2015); Yingli Prelim. Analysis Mem. at 2, CD 572, bar code 3428066-01 (Dec. 18, 2015); see also Antidumping Methodologies, 71 Fed. Reg. 61,716-01 (Dep't Commerce Oct. 19, 2016), available at https://www.federalregister.gov/documents/2006/10/19/E6-17376/antidumping-methodologies-market-economy-inputs-expected-non-market-economy-wages-duty-drawback-and (last visited Oct. 13, 2017).  Here, both respondents reported purchasing a small percentage of their backsheet from market economy suppliers.  Accordingly, Commerce weight-averaged the market economy prices each respondent paid for its backsheet with the Thai surrogate value to achieve a value for the backsheet input for both respondents.  See Trina Prelim. Calculation Mem. at 2–3, Attach. II, CD 566, bar code 3427993-01 (Dec. 18, 2015); Yingli Prelim. Analysis Mem. at 2, CD 572, bar code 3428066-01 (Dec. 18, 2015); Yingli Prelim. Analysis Mem. Attach. II, CD 578, bar code 3428066-07 (Dec. 18, 2015).  SolarWorld does not challenge Commerce's methodology with regard to market economy prices; rather, SolarWorld argues that the market economy prices paid by respondents for purchases of backsheets should serve as a benchmark with which to assess Commerce's surrogate value.  See SolarWorld Br. 30–32.

Decision Memo at 41–42.  SolarWorld's argument that Commerce should rely on these market prices to assess the representativeness of the surrogate values for backsheets is therefore unpersuasive.

### F.  Nitrogen

Trina challenges Commerce's use of Thai import data to value Trina's nitrogen input, arguing that the Thai import data is aberrational and that Commerce's determination is unsupported by substantial evidence because the agency did not explain the discrepancies between the Thai data and all alternative values on the record.  <u>See</u> Trina Br. 9–16.  Defendant contends that Commerce reasonably determined that the Thai import data was the best available information for valuing Trina's nitrogen input, as Commerce evaluated whether the data was aberrational according to its practice and lacking specific evidence demonstrating aberration.  <u>See</u> Def.'s Resp. 30–32.  For the reasons that follow, Commerce's selection of the Thai import data for valuing the nitrogen input is reasonable.

Where there is a claim that data is aberrational, Commerce must address evidence of aberration in order to demonstrate that the data is nonetheless the best information available.  <u>See</u> <u>Universal Camera Corp.</u>, 340 U.S. at 488 (noting that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  Here, Commerce explained its practice for assessing whether data is aberrational, noting that:

> when determining whether data are aberrational, the Department has found that evidence that an AUV in the country at issue is high compared to another AUV (such as the Bulgarian import AUV here) does not necessarily

establish that the GTA data for that country are unreliable, distorted or misrepresentative.  Rather, in analyzing whether an AUV is aberrational or distortive, the Department typically compares the AUV for the input during the POR in the country at issue to AUVs for that input during the POR from all countries found to be at a level of economic development comparable to the NME or compares AUVs of the input during the POR in the country at issue to AUVs for that input in the country at issue in prior years.

Final Decision Memo at 62 (internal citations omitted).

Consistent with its practice, Commerce compared the Thai value to values from economically comparable countries.  See id.  Although most of these values were lower than the Thai value, at least one other was significantly higher than the Thai value.  Id. (noting the value for Ukraine as $78.75 USD per kg).  On this basis, Commerce concluded that the Thai data was within range of the available values from other economically comparable countries and therefore was not aberrational.  Id.  Commerce determined that the average unit values on the record from economically comparable countries "do not demonstrate that the Thai AUV is aberrational."  Id.

Trina placed four alternative values on the record: the average nitrogen prices from Bulgarian import data during the POR (averaging $0.0964 per kilogram), actual nitrogen purchases by Thai companies during the POR (averaging $0.1239 per kilogram), a price quotation to Trina for nitrogen in Thailand (averaging $0.0679 per kilogram), and U.S. International Trade Commission export data to Thailand during the POR (averaging $0.1625 per kilogram).  See Trina Br. 5–6, 9–10.  Trina argues that these values demonstrate that the Thai value is aberrational, as the Thai value was between 72 and 173 times greater than each of its four proposed alternate values.  Id. at 10.  Commerce declined to assess aberration by comparing three of Trina's four proposed alternate

values to the Thai data.  <u>See</u> Final Decision Memo at 62.  Commerce explained its

preference to use surrogate value data that is publicly available:

> [T]he Department's preference is to use published prices that are widely
> available, rather than prices and price quotes from a limited number of
> suppliers that can only be obtained through direct inquiry.  Publicly
> available, published prices generally do not suffer from potential biases
> compared to: (1) price quotes, such as the Thai price quotes submitted by
> Trina, that can be obtained through research by private firms; or (2)
> individual prices, such as the three invoice prices submitted by Trina, which
> are not representative of a broad market average.

<u>Id.</u> at 61.  It is reasonably discernible that Commerce declined to use these values to

assess aberration for the same reasons.  <u>See</u> <u>id.</u> at 62 (noting, regarding Trina's argument

that the Thai data is high in relation to the proposed alternate surrogates, that

"[Commerce's] preference is to use published prices that are widely available, rather than

prices and price quotes from a limited number of suppliers that can only be obtained

through direct inquiry due to potential biases.").  If a value that is not publicly available is

considered potentially unreliable for purposes of serving as a surrogate value, it follows

that the value may also not be an appropriate benchmark by which to determine the

reliability of other potential surrogate values.[22]

---

[22] Trina argues that Commerce's conclusion "ignores the massive differences in import quantities and the actual weighted-average import values of these countries." Trina Br. 13. Trina calculated a "weighted-average" for the other five economically comparable countries by dividing the total value from these countries by the total quantity from these countries, which results in an overall AUV of $0.1551 USD per kg. <u>Id.</u> Trina compared this figure to the Thai AUV of $ 11.68 USD per kg, and claimed that the Thai AUV is "more than 75 times higher than the weighted-average import values from the other five [economically comparable] countries." <u>Id.</u> This method is not the method by which Commerce assesses aberration, and does not demonstrate that Commerce's method is unreasonable.

(footnote continued)

Additionally, Trina argues U.S. export data for the same period contradicts Thai

import data:

> According to monthly data obtained from the U.S. International Trade
> Commission's Dataweb, there were 586,305 kilograms of nitrogen exported
> from the United States to Thailand during the POR with a value of $95,286.
> In contrast, the GTA Thai import data showed only 4,298 kilograms of
> nitrogen imports from the United States with a value of $317,480. Thus,
> while the reported Thai import value greatly exceeds the reported U.S.
> export value by over $220,000, the quantity reported to be imported
> into Thailand from the United States during this period is lower than the U.S.
> exports to Thailand during the same period by 582,000 kilograms. The
> significant and inexplicable disparity between the reported Thai imports of
> nitrogen from the United States and the reported U.S. exports to Thailand
> calls into serious question the reliability of the GTA Thai import data and the
> resulting average Thai import price of $73.87/kg, which is 45,458% higher
> that the nitrogen export price to Thailand reported by the U.S. International
> Trade Commission of $0.1625/kg (which is much more in line with the other
> record pricing information for nitrogen). Trina presented this benchmarking
> line of argumentation to Commerce, but it was ignored and was not
> addressed at all in the Final Results.

Id. at 11 n.1.  Commerce explained its preference for using surrogate value data from a

single surrogate country that is, among other characteristics, "non-export" data. See Final

Decision Memo at 61.   It is reasonably discernible that Commerce would, then, not

consider export data to be a measure against which to assess the reliability of import

data.  Further, Defendant emphasized at oral argument that the focus for Commerce is

on import data, not export data, and that the reported U.S. export value does not

demonstrate that the choice to use Thai import data is unsupported by substantial

---

Trina also emphasizes that, because only the Ukraine value was higher than the Thai value and the quantity of imports from Ukraine was low, the Thai value is "higher—and significantly higher—than 99.5% of total nitrogen imports in these countries during the POR." Trina Br. 13.  Both of these arguments ask the court to reweigh the evidence and do not demonstrate that Commerce's methodology or conclusions are unreasonable.

evidence.  Oral Arg. Tr. 49, Sept. 5, 2017, ECF No. 97.  As Commerce's practice is to

utilize import data, this export data, without more, does not demonstrate that the selection

of the Thai import data is unsupported by substantial evidence.

##### II.  The Use of Import Data with Reported Quantities of Zero

Trina argues that Commerce erred by including values for import data with

reported quantities of zero in the surrogate value calculations, contending that the

inclusion of these zero-quantity values resulted in distorted surrogate values.  Trina Br.

16–19.  Trina argues that Commerce's conclusion that there is no evidence that the data

is unreliable is unsupported by substantial evidence because the values do not correlate

to other low-quantity values on the record.  Id. at 18.  Defendant responds that Commerce

reasonably determined that the values were reliable because the agency found no basis

in the record to conclude that the zero quantities were the result of errors.  Def.'s Resp.

33.  For the reasons that follow, the court remands for Commerce to further explain or

reconsider its determination that the inputs with reported quantities of zero are reliable.

Here, Commerce concluded that the values reported with zero quantities are

"attributable to rounding small quantities down to zero" and, because it found no reason

to suspect errors in the data, found that the data was reliable.  Final Decision Memo at

64.  Defendant emphasizes that it is within Commerce's authority to make the "reasonable

assumption" that the zero quantities were simply the result of rounding.  Def.'s Resp. 33

(citing Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Tech., Salaried, & Mach.

Workers, 6 F.3d 1511, 1520 (Fed. Cir. 1993)).  To support its determination, Commerce

referenced its reasoning in the underlying investigation in which the agency determined

Consol. Court No. 16-00134                                                                 Page 33
**PUBLIC VERSION**

that values with reported quantities of zero were reliable, but acknowledged that the facts

of this review are distinguishable in that the majority of the values with reported quantities

of zero are not within range of other low-quantity values on the record, as they were in

the investigation.  Final Decision Memo at 64.  In the investigation, the values reported

with zero quantities were within range of other low-quantity values on the record, such

that the reported zero quantities did not appear to be random error:

> If such instances involve aberrational data (e.g., situations caused by data
> collection or data input errors), they should occur at random. Instead, all of
> the import values where the stated quantity is zero are instances of
> relatively low import values that are typically in the range of import values
> from other countries where the imported quantity is very small.  Given the
> low import values for the zero quantity imports, the fact that these values
> are generally consistent with low volume imports, and given that Thai import
> quantities collected by GTA are all rounded to the nearest whole number,
> these instances appear to involve rounding import quantities to zero.

Issues and Decision Mem. for the Final Determination in the [ADD] Investigation of

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the

[PRC],     A-570-979,     40     (Oct.     9,     2012),     <u>available     at</u>

http://ia.ita.doc.gov/frn/summary/prc/2012-25580-1.pdf (last visited Oct. 13, 2017) ("Solar

I PRC Investigation Final Decision Memo").  Here, it is uncontested that the majority of

the     values     with     zero     quantities     were     not     within

range of other low-quantity values.[23]  <u>See</u> Final Decision Memo at 64.

---

[23] After acknowledging the differing facts in this review, Commerce referenced its reliance on an
assessment of randomness in the investigation which it used to determine whether the data was
reliable:

(footnote continued)

In light of the evidence on the record that the values are not within range of other low-quantity imports and the lack of an alternate reasonable explanation as to why these values are reliable, Commerce's conclusory statement that it finds no basis for determining the values are unreliable is insufficient.  See Universal Camera Corp., 340 U.S. at 488 (noting that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  There may be a reasonable explanation as to why the zero-quantity imports have values that are not within range of low-quantity inputs elsewhere in the database.  But Commerce has not provided such an explanation here.  Without further explanation, Commerce's assumption that the zero quantities were the result of rounding is not reasonable.

---

Consistent with the reasoning in the investigation, if the reported information (zero quantities) were the result of errors, we would expect less consistency and more randomness with respect to the type of error observed. For example, if the data were merely erroneous, we would expect errors to also occur with respect to the reported value in at least some instances; however there are no imports in the data with a zero value. Since there appear to be no such errors with respect to value, we conclude that the reported zero quantities are reliable, attributable to rounding small quantities down to zero.

Final Decision Memo at 64 (emphasis in original).  However, as discussed above, in the investigation, Commerce emphasized that if quantities of zero were the result of random error, the values would generally not be within the range of other low quantity values on the record.  See Solar I PRC Investigation Final Decision Memo at 40.  In the investigation, Commerce does not reason that, if the zero quantities were the result of random error, there would also be instances of a reported zero value.  See id.  Further, Commerce has not explained why it would not be possible to make random errors in reporting quantities without making corresponding errors in reporting values.  Commerce provides no other reasonable explanation as to why the values with reported zero quantities are nonetheless reliable in this review.

### III. The Use of Styromatic's Financial Statements To Calculate Financial Ratios for Overhead, SG&A Expenses, and Profits

SolarWorld challenges Commerce's selection of Styromatic's financial statements for valuing respondents' overhead, SG&A expenses, and profit.  SolarWorld Br. 38–43.  SolarWorld claims that Commerce should have chosen the financial statement on the record for Thai company Ekarat Engineering (Public) Co., Ltd. ("Ekarat") because Ekarat is the only Thai company with a financial statement on the record which produces identical merchandise.  Id. at 40–43.  Defendant responds that Commerce's selection of Styromatic's financial statements is supported by substantial evidence and consistent with agency practice, as Styromatic's financial statements are the only statements on the record that do not evidence receipt of countervailable subsidies during the POR.  See Def.'s Resp. 34–37.  For the reasons that follow, Commerce's determination to value respondents' overhead, SG&A expenses, and profit using Styromatic's financial statements is reasonable and is sustained.

Commerce uses the best available information to value inputs, including the FOPs used to produce the merchandise and "an amount for general expenses and profit."  19 U.S.C. § 1677b(c)(1).  Commerce selects a surrogate value for each of these inputs from a source in a market economy country that is economically comparable to the NME country and a significant producer of the merchandise in question.  Id. §§ 1677b(c)(4)(A)–(B); 19 C.F.R. § 351.408(b).  Commerce calculates the amount for general expenses and profit using publicly available financial data from a producer of identical or comparable merchandise.  19 C.F.R. § 351.408(c)(4).  In the final

determination, Commerce identified six producers of comparable merchandise while

stating that the record lacked financial statements for a producer of merchandise identical

to the subject merchandise.[24]   Final Decision Memo at 37.   Of the six producers under

consideration from the primary surrogate country, including Ekarat, Commerce explained

that Styromatic was the only company whose statement did not evidence receipt of a

countervailable subsidy.   Id.   Therefore, Commerce determined that Styromatic's

statements constitute the best available information.   See id. at 37–38.   This

determination is reasonable, as evidence of countervailable subsidies would render the

statements unrepresentative and accordingly would not provide an accurate surrogate

value.   See Rhone Poulenc, Inc., 899 F.2d at 1191 (explaining the agency's duty to make

a selection that will enable it to ultimately calculate accurate dumping margins).

---

[24] At oral argument, Defendant conceded that evidence in the record supports a determination
that Ekarat is a producer of identical merchandise.  See Oral Arg. Tr. 69.  Defendant argues that
Commerce nonetheless reasonably determined that Styromatic is the best available information
on the record because evidence of receipt of a countervailable subsidy outweighs Commerce's
preference for identical rather than comparable merchandise.  See id. at 69–71.  It is reasonably
discernible that Commerce chose Styromatic because it was the only company not to receive
countervailable subsidies and that, regardless of whether Ekarat produced identical or
comparable merchandise, Commerce viewed Styromatic as the source of the best available
information because it did not receive a subsidy while Ekarat did.  See Final Decision Memo at
37.   Commerce chose Styromatic as the best available information in the preliminary
determination, even though the agency found Ekarat to be "a manufacturer of solar cells and
modules, as well as a distributor and servicer of electrical transformers." Prelim. Decision Memo
at 27.  Further, in the final determination, although Commerce concluded that Ekarat produced
comparable merchandise, the agency reiterated its finding from the preliminary determination
"that Ekarat benefitted from countervailable subsidies."  Final Decision Memo at 37.  Given the
conclusion in the preliminary determination that Styromatic constituted the best available
information despite the preliminary finding that Ekarat was a producer of identical merchandise,
it is reasonably discernible that the finding that Styromatic did not benefit from countervailable
subsidies, while Ekarat did, formed the basis of Commerce's decision.

SolarWorld argues that Commerce unreasonably concluded that Styromatic did

not receive a countervailable subsidy during the POR because it received a subsidy two

months prior to the POR and there was no evidence of termination of the assistance prior

to the POR.  See SolarWorld Br. 38–40.  Commerce assesses the financial statements

on record for the POR.  Commerce explained that the petitioner did not demonstrate that

Styromatic received a countervailable subsidy during the POR or that the agency has

found the assistance received prior to the POR to be countervailable.  Final Decision

Memo at 37.  SolarWorld presents no evidence that has not been addressed by

Commerce which indicates that Styromatic received a subsidy during the POR or that

such subsidy has been found countervailable.  Commerce's determination is supported

by substantial evidence.

### IV. The Application of AFA to Trina's Unreported FOPs

Finally, Trina challenges Commerce's application of AFA to the unreported FOPs

for Trina's purchases of solar cells from unaffiliated solar cell suppliers.  See Trina Br.

19–23.  Trina argues that Commerce's application of AFA is not reasonable because

Commerce did not explain what percentage of a respondent's FOP's for purchased solar

cells must have been unreported FOPs for Commerce to consider the portion significant

to warrant application of AFA.  Id. at 22.  Defendant responds that Commerce properly

applied AFA with regard to incomplete information, having reasonably determined that

Trina failed to act to the best of its ability in providing a complete and accurate response

to requests for production information.  See Def.'s Resp. 39–46.  For the reasons that

follow, Commerce's determination to apply AFA to value Trina's unreported FOPs is reasonable.

In order to calculate accurate dumping margins, Commerce requests information from respondents.  If Commerce determines it cannot accurately calculate a respondent's dumping margin based on that information, Commerce shall use "facts otherwise available" for the missing information.[25]  See 19 U.S.C. § 1677e(a).  Commerce may apply adverse inferences in selecting from among the facts otherwise available where it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with [its] request for information . . ."[26]  Id. § 1677e(b).  Although the statute does not define the phrase "best of its ability," compliance with the standard "is determined by assessing whether [a] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Here, Trina did not report production inputs for a portion[27] of the solar cells it purchased from unaffiliated solar cell suppliers.  See Trina Br. 21–22; Final Decision

---

[25] Specifically, Commerce resorts to facts otherwise available when a respondent withholds requested information, fails to timely provide requested information or fails to provide information in the requested form and manner, "significantly impedes" an antidumping proceeding, or provides information that cannot be verified.  19 U.S.C. § 1677e(a)(2).

[26] While the statute provides separately for the use of facts otherwise available and the subsequent application of an adverse inference regarding those facts, Commerce uses the term "adverse facts available" or "AFA" to refer to the application of the "facts otherwise available" and "adverse inferences" provisions of 19 U.S.C. § 1677e.  See, e.g., Final Decision Memo at 52–53 (explaining Commerce's approach to applying AFA when an interested party fails to cooperate by not acting to the best of its ability in responding to Commerce's requests for information).

[27] Specifically, Trina did not report production inputs for [[          ]] of the solar cells it purchased from unaffiliated solar cell suppliers.  See Trina Br. 21–22.

Memo at 53–54; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into

Modules, from the [PRC]: Unreported Factors of Production, A-570-979, at 9, PD 524,

bar code 3427858-01 (Dec. 18, 2015) ("Trina Unreported FOP Memo").  Commerce used

information otherwise available with an adverse inference for Trina's unreported cell

inputs.  See Final Decision Memo at 52–53.   As a result, Commerce "relied on the highest

consumption figures for those same inputs that were reported by other suppliers or by the

respondent."   Trina Unreported FOP Memo at 9; see Final Decision Memo at 54.

Commerce emphasized that the methodology "is precisely proportional to the missing

information, to induce the cooperation of Trina's suppliers in future segments of this

proceeding," Final Decision Memo at 57, and that this methodology was consistent with

its practice regarding the valuation of unreported FOPs:

> The Department has previously excused respondents from reporting FOPs
> from some of their smallest suppliers in situations where a respondent has
> a large number of suppliers, and also in situations where the unreported
> FOP data are of limited quantity.   This case is distinguishable from
> situations where the Department has excused respondents from reporting
> FOPs, and distinguishable from the situation of Yingli in this administrative
> review, because the percentage of solar cell inputs provided by Trina's
> unaffiliated solar cell suppliers is significant and cannot reasonably be
> characterized as being of limited quantity.

Id. at 52.

Commerce explained that its decision to apply AFA turned on the perceived ability

of Trina to induce compliance from the suppliers, due to what Trina acknowledged were

long-standing business relationships between Trina and the suppliers.  Final Decision

Memo at 56.  Commerce reasonably determined that these relationships provided at least

some leverage to induce compliance:

> . . . Based on Trina's acknowledgment of its long-term business relationship
> with its largest cell suppliers, we find that it [is] reasonable to conclude that
> Trina has some business mechanism to induce its suppliers to cooperate.
> By applying AFA with respect to the missing data, [Commerce] is relying on
> the statutory means that it has available to induce the cooperation of these
> parties because Trina may choose not to do business with them in the future
> due to their lack of cooperation and/or select suppliers that are willing to
> commit to participation in an antidumping proceeding.

Trina Unreported FOP Memo at 8. Commerce's explanation for valuing Trina's unreported FOPs using AFA is reasonable. The determination to apply AFA was made in consideration of the magnitude of inputs not reported and of Trina's apparent ability to induce compliance. Final Decision Memo at 55–56.

Trina argues in the alternative that Commerce should apply AFA only to the portion of Trina's unreported FOPs that are above Yingli's percentage of unreported FOPs since Commerce determined that Yingli had an insignificant percentage of unreported FOPs.[28] See Trina Br. 23. Trina argues that this method would ensure that the respondents were treated similarly. Id. However, nothing in the statute requires Commerce to apply AFA as Trina suggests. It is not for the court to say whether Trina's proposed alternate methodology for applying AFA to Trina's unreported FOPs would be reasonable. Trina's proposed alternative does not demonstrate that Commerce's methodology—to apply AFA to all of Trina's unreported FOPs, having determined that a significant portion of FOPs were unreported—was unreasonable.

---

[28] Specifically, Trina argues that Commerce should only apply AFA to the portion of Trina's unreported FOPs above [[          ]], "because Commerce already had determined that Yingli's purchased cell portion of [[          ]] was not significant." Trina Br. 23.

**CONCLUSION**

For the foregoing reasons, the court sustains Commerce's surrogate value selections for valuing respondents' aluminum frames, semi-finished polysilicon ingots and blocks, solar backsheet, and nitrogen inputs.   The court also sustains Commerce's selection of financial statements for calculating financial ratios for respondents' overhead, SG&A expenses, and profit, and Commerce's application of adverse facts available to respondent's unreported, purchased solar cells.

This matter is remanded to Commerce for reconsideration or further explanation consistent with this opinion Commerce's surrogate value selection for respondents' tempered glass and scrapped solar cells and modules inputs, as well as Commerce's determination to include import data with reported quantities of zero in the surrogate value calculations.   In accordance with the foregoing, it is

**ORDERED** that Commerce's surrogate value selections for respondents' tempered glass and scrapped solar cells and modules inputs, and Commerce's inclusion of import data with reported quantities of zero in the surrogate value calculations, are remanded for further explanation or reconsideration consistent with this opinion. Commerce shall file its remand determination with the court within 45 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand determination; and it is further

**PUBLIC VERSION**

      **ORDERED** that the parties shall have 15 days thereafter to file a reply to comments

on the remand determination.




               /s/ Claire R. Kelly
               Claire R. Kelly, Judge

Dated: October 18, 2017
        New York, New York