

UNITED STATES COURT OF INTERNATIONAL TRADE
ONE FEDERAL PLAZA
NEW YORK, NY 10278-0001

CHAMBERS OF
Claire R. Kelly
Judge

May 4, 2021

John Robert Magnus, Esq.
Tradewins LLC
1330 Connecticut Avenue, NW
Washington, DC 20036
Email:        jmagnus@tradewinsllc.net

Robert George Gosselink, Esq.
Jarrod Mark Goldfeder, Esq.
Jonathan Michael Freed, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003
Email:        rgosselink@tradepacificlaw.com
              jgoldfeder@tradepacificlaw.com
              jfreed@tradepacificlaw.com

Richard L.A. Weiner, Esq.
Justin Ross Becker, Esq.
Rajib Pal, Esq.
Shawn Michael Higgins, Esq.
Sidley Austin, LLP
1501 K Street, NW
Washington, DC 20005-1401
Email:        rweiner@sidley.com
              jbecker@sidley.com
              rpal@sidley.com
              shawn.higgins@sidley.com

Craig Anderson Lewis, Esq.
Jonathan Thomas Stoel, Esq.
Lindsay K. Brown, Esq.
Hogan Lovells US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004
Email:      craig.lewis@hoganlovells.com
              jonathan.stoel@hoganlovells.com
              Lindsay.Brown@hoganlovells.com

Tara Kathleen Hogan, Esq.
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Email:      tara.hogan@usdoj.gov

Brendan Scott Saslow, Esq.
Of Counsel
U.S. Department of Commerce
Chief Counsel of Trade Enforcement and Compliance
1401 Constitution Avenue, NW
Suite 3614
Washington, DC 20230-0001
Email:      brendan.saslow@trade.gov

Justin Reinhart Miller, Esq.
U.S. Department of Justice
International Trade Field Office
26 Federal Plaza
New York, NY 10278
Email:      justin.r.miller@usdoj.gov

      Re:    *SolarWorld Americas, Inc. et al. v. United States*
              Consol. Court No. 16-00134

Consol. Court No. 16-00134

Page **3** of **6**

Dear Counsel:

     As you know, oral argument in this case will be held virtually on Wednesday, May 19, 2021 at 10:15 a.m. in Courtroom 1 of the James L. Watson Courthouse of the United States Court of International Trade, One Federal Plaza, New York, NY 10278. The court has examined the parties' submissions and would like counsel to be prepared to address the following issues.

**For Consolidated Plaintiffs and Plaintiff-Intervenor**

1. Notwithstanding any criticisms or qualifications you assert as to its content, do you concede that the U.S. Department of Commerce's ("Commerce") practice for determining whether average unit value ("AUV") data from a primary surrogate country are aberrational is to determine whether the overall AUV for imports of the subject input from all countries into the primary surrogate country deviates markedly from the overall AUV for imports of the subject input into other potential surrogate countries?

2. Commerce states that it "determines whether data are aberrational on a case-by-case basis after considering the totality of the circumstances." Redetermination Pursuant to Ct. Remand Order at 23, Jan. 13, 2021, ECF No. 187-1 ("Third Remand Results"). Why is Commerce's position unreasonable?

3. You (Plaintiff-Intervenors) cite Tri Union Frozen Prods. Inc. v. United States, Cmts. of [Pl.-Intervenors] Canadian Solar et al. & [Shanghai] BYD Opp'n Results of Redetermination Pursuant to Ct. Remand at 15–16, Feb. 24, 2021, ECF No. 192 ("Pl.-Intervenors' Br."), but doesn't this case underscore the fact that Commerce needs to analyze what is aberrational on a case-by-case basis? See Tri Union Frozen Prods. Inc. v. United States, 41 CIT __, __, 227 F. Supp. 3d 1387, 1397 (2017) ("Tri Union").

4. Given that the U.S. International Trade Commission's ("ITC") export data indicates that "136 times more nitrogen was exported from the United States into Thailand . . . than the [Global Trade Atlas ("GTA")] data indicated was imported into Thailand from the United States[,]" you argue Commerce's attempt to explain the discrepancy between ITC export data and Thai GTA data by appealing to differences in timing, reporting, and inspection requirements between the two datasets is unavailing. See Consol. Pl. Trina's Cmt. on Final Results of Third Redetermination Pursuant to [Ct.] Remand at 15, Feb. 24, 2021, ECF No. 190 (quoting SolarWorld Ams. Inc. v. United States, 962 F.3d 1351, 1358 (2020) ("SolarWorld")); see also Pl.-Intervenors' Br. at 15–16.

    a. Even if "[t]he ITC data and the Thai GTA data cannot both be correct[,]" <u>SolarWorld</u>, 962 F.3d at 1358, without record evidence demonstrating which dataset is the correct source, why is it unreasonable for Commerce to defer to its methodological choice not to rely solely on such disparities as the basis for disregarding import data from a surrogate country?  See <u>Third Remand Results</u> at 29 ("[I]f Commerce was obligated to reject GTA import data merely because of such differences, it would hamstring Commerce's [nonmarket economy ("NME")] practice and may severely limit its use of most import data to value FOPs; thus, frustrating the intent of the NME provisions of the statute.").

    b. Isn't it the case that Thai imports of nitrogen from the United States "amount to only approximately nine percent of its total POR nitrogen imports by quantity[?]"  <u>Third Remand Results</u> at 29 (citing Letter Re: Submission of Publicly Available Factual Info. to Rebut, Clarify or Correct at Ex. 5B, PDs 497–499, bar codes 3411020-01–03 (Oct. 29, 2015)).  If so, why is it unreasonable for Commerce to conclude that the fact that "a relatively small portion of the GTA import data differ from U.S. export data" is insufficient to reject the entirety of the Thai GTA data?  <u>Id.</u>

5. Given Commerce's position that low AUVs for Mexico, Bulgaria, and Romania can be explained by the fact that large quantities of nitrogen are imported into those countries from neighboring countries, <u>see, e.g.</u>, <u>Third Remand Results</u> at 21–22, why is it necessarily the case that "[t]he only reasonable inference is that AUV derived from the Thai GTA data . . . is likely incorrect and unreliable[?]"  <u>See, e.g.</u>, Pl.-Intervenors' Br. at 16 (citations omitted).

6. Why is it unreasonable for Commerce to take into account the burden of "assess[ing] the suitability and/or potential aberration of each AUV based on the import quantities used to calculate the AUV" and entertaining "subjective arguments" and "cherry picking" from parties when formulating its methodology for determining whether overall AUV data from a surrogate country is aberrational?  See <u>Third Remand Results</u> at 13.

**For Defendant**

1. Is it essentially your position that the Court of Appeals for the Federal Circuit ("Court of Appeals") misunderstood Commerce's practice?  <u>See generally SolarWorld</u>, 962 F.3d 1351.

2. Notwithstanding Commerce's clarification of its practice:

    a. Didn't the Court of Appeals also criticize Commerce's "bookend" methodology as being illogical, and wasn't that the more pertinent criticism? See SolarWorld, 962 F.3d at 1357–58 ("[T]he use of a bookend methodology here is illogical because it fails to account for the fact that countries on one end of the bookend (Bulgaria and Romania) account for the vast majority (99.22%) of the recorded nitrogen imports, that these countries have a substantially lower average unit value than that of Thailand, and that the other countries to which Commerce compares the Thai average unit value (the other end of the bookend) together represent only a fraction of a percent of the quantity (about 0.40%) recorded in the GTA.").

    b. Did the Court of Appeals generally suggest that there was a problem with the bookend methodology in this case because of a distortive effect of low quantity imports? See SolarWorld, 962 F.3d at 1357–58.

3. You cite Tri Union for the proposition that "Commerce clarified that its practice is to consider data to be aberrational when it is an extreme outlier, is distorted or misrepresentative, or is somehow incorrect." See Def.'s Resp. to Cmts. on [Third Remand Results] at 4, Mar. 26, 2021, ECF No. 193 ("Def.'s Resp."). Aside from this case being non-binding, aren't you misstating the court's opinion which underscores that while Commerce stated that its practice was to consider data aberrational when it is an extreme outlier, Commerce failed to provide a definition or explanation for aberrational? See Tri Union, 41 CIT at __, 227 F. Supp. 3d at 1394–95.

4. Although differences between ITC export data and Thai GTA import data may be explained by differences in timing, reporting, and inspection requirements, how does that reasonably address Plaintiffs' argument that the ITC data indicates 380 times more nitrogen was exported into Thailand than is reported by the Thai GTA data? Doesn't the large variation suggest that the Thai GTA data can't be trusted?

5. Commerce posits that low AUVs for Mexico, Bulgaria, and Romania can be explained by the fact that large quantities of nitrogen are imported into those countries from neighboring countries. See Third Remand Results at 21–22. Is there any record evidence that supports commerce's position?

6. In its remand redetermination, what support does Commerce cite for its finding "that Bulgaria did not produce subject merchandise and Thailand does"? See Def.'s Resp. at 21 (citing Decision Memo. for the Final Results of the 2013–2014 Antidumping Duty Admin. Review of Crystalline Silicon

Consol. Court No. 16-00134

Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China at 7–8, A-570-979, (June 13, 2016), ECF No. 21-5). How do you respond to Plaintiff-Intervenors' argument that Commerce does not cite record evidence to support its assertions with respect to the purity of nitrogen used in solar cells? See Pl.-Intervenors' Br. at 14–15.

 

                                                Sincerely,

                                               /s/ Claire R. Kelly
                                              Claire R. Kelly, Judge

Cc: Steve Taronji
     For docketing