Slip Op. 21-91

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SOLARWORLD AMERICAS, INC. ET AL.,** | |
| **Plaintiff and Consolidated Plaintiffs,** | |
| **and** | |
| **CANADIAN SOLAR INC. ET AL.,** | |
| **Plaintiff-Intervenors and Consolidated Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Consol. Court No. 16-00134** |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **CHANGZHOU TRINA SOLAR ENERGY CO., LTD. ET AL.,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | |

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's third remand redetermination in the second administrative review of the antidumping duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Dated: July 28, 2021

Robert G. Gosselink and Jonathan M. Freed, Trade Pacific PLLC, of Washington DC, for consolidated plaintiffs, Changzhou Trina Solar Energy Co., Ltd.; Trina Solar (Changzhou) Science and Technology Co., Ltd.; Trina Solar (U.S.) Inc.; Yancheng Trina Solar Energy Technology Co., Ltd.; Changzhou Trina Solar Yabang Energy Co., Ltd.; Tupan Trina Solar Energy Co., Ltd.; and Hubei Trina Solar Energy Co., Ltd.

Craig A. Lewis, Jonathan T. Stoel, and Lindsay K. Brown, Hogan Lovells US LLP, of Washington, D.C., for plaintiff-intervenors, Canadian Solar International Limited; Canadian Solar Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; Canadian Solar (USA), Inc.; Canadian Solar Inc.; BYD (Shangluo) Industrial Co., Ltd. and Shanghai BYD Co., Ltd.

Tara K. Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, and Jeanne E. Davidson, Director. Of counsel on the brief was Brendan S. Saslow, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Kelly, Judge:   Before the court is the U.S. Department of Commerce's ("Commerce") third remand determination pursuant to the court's remand order, see Order, Sept. 2, 2020, ECF No. 176 ("Remand Order"), issued following the Court of Appeals for the Federal Circuit's ("Court of Appeals") decision in SolarWorld Americas, Inc. v. United States, 962 F.3d 1351 (Fed. Cir. 2020) ("SolarWorld IV"). See Final Results of Redetermination Pursuant to Court Order, Jan. 14, 2021, ECF No. 187-1 ("Third Remand Results").   In SolarWorld IV, the Court of Appeals, inter alia, vacated this court's judgment entered pursuant to SolarWorld Americas, Inc. v. United States, 42 CIT __, 355 F. Supp. 3d 1306 (2018) ("SolarWorld III"), and remanded Commerce's decision to use Thai import data published by the Global

Trade Atlas ("Thai import data") to construct a surrogate value for Trina's[1] nitrogen

input in Commerce's second administrative review of the antidumping duty ("ADD")

order covering crystalline silicon photovoltaic cells, whether or not assembled into

modules, from the People's Republic of China ("China") covering the period December

1, 2013 through November 30, 2014.  See SolarWorld IV, 962 F.3d at 1358–59; see

also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,

From [China], 81 Fed. Reg. 39,905 (Dep't Commerce June 20, 2016) (final results of

[ADD] administrative review and final determination of no shipments; 2013-14)

("Final Results") and accompanying Issues and Decision Memo., A-570-979, (June 13,

2016), ECF No. 21-5 ("Final Decision Memo").[2]

    In SolarWorld Americas, Inc. v. United States, 41 CIT __, 273 F. Supp. 3d 1254

(2017) ("SolarWorld I"), the court sustained Commerce's use of the average unit value

("AUV") of nitrogen imports into Thailand as a surrogate value for Trina's nitrogen

input, while remanding on other grounds. SolarWorld I, 273 F. Supp. at 1271–73.

This court ultimately fully sustained Commerce's Results of Second Remand

Redetermination Pursuant to Court Order, July 31, 2018, ECF No. 144-1 ("Second

Remand Results").  SolarWorld III, 355 F. Supp. 3d at 1310. However, that decision

---

[1] Consolidated Plaintiffs Changzhou Trina Solar Energy Co., Ltd.; Trina Solar (Changzhou) Science and Technology Co., Ltd.; Yancheng Trina Solar Energy Technology Co., Ltd.; Changzhou Trina Solar Yabang Energy Co., Ltd.; Turpan Trina Solar Energy Co., Ltd.; and Hubei Trina Solar Energy Co., Ltd. are referred to, collectively, as "Trina."
[2] The Final Decision Memo is also referred to as the "final determination."

was vacated and remanded pursuant to <u>SolarWorld IV</u>.  <u>SolarWorld IV</u>, 962 F.3d at 1358–59.

In the <u>Third Remand Results</u>, Commerce continues to value Trina's nitrogen input using Thai import data.  <u>Third Remand Results</u> at 2.  Trina and Plaintiff-Intervenors Canadian Solar[3] and BYD[4] object to the <u>Third Remand Results</u> on the grounds that the Thai surrogate value is aberrational, Commerce does not adequately justify its use of Thai import data to value Plaintiff's nitrogen inputs because Commerce's explanation is speculative, and Commerce does not adequately explain the discrepancies between Thai import data and U.S. export data. <u>See</u> Consol. Plt. Trina's Comment on the Final Results of Third Redetermination Pursuant to Remand, Feb. 24, 2021, ECF No. 190 ("Trina Br."); Comments of [Canadian Solar] and BYD in Opp'n to the Results of Redetermination Pursuant to C. Remand, Feb. 24, 2021, ECF No. 192 ("CS-BYD Br.").  Defendant United States argues that Commerce complies with the court's remand order by sufficiently explaining why the Thai import data is reliable and not aberrational. <u>See</u> <u>Defendant's Response to Comments on the Remand Determination</u>, March 26, 2021, ECF No. 193 ("Def.'s Br.").

---

[3] Plaintiff-Intervenors Canadian Solar Inc.; Canadian Solar (USA) Inc.; Canadian Solar Manufacturing (Changshu), Inc.; Canadian Solar Manufacturing (Luoyang), Inc.; and Canadian Solar International Limited are referred to, collectively, as "Canadian Solar."
[4] Plaintiff-Intervenors BYD (Shangluo) Industrial Co., Ltd. and Shanghai BYD Co., Ltd. are referred to collectively as "BYD," and collectively, Trina, Canadian Solar, and BYD are referred to as "Plaintiff."

For the following reasons, the court remands Commerce's decision to continue using Thai import data to value Trina's nitrogen input.

## BACKGROUND

The court presumes familiarity with the facts of this case as set out in its and the Court of Appeals' previous opinions ordering remand to Commerce, and now recounts only those facts relevant to the court's review of the <u>Third Remand Results</u>. <u>See</u> <u>SolarWorld IV</u>, 962 F.3d at 1355–56; <u>SolarWorld I</u>, 273 F. Supp. 3d at 1259–60; <u>see also</u> <u>SolarWorld Americas, Inc. v. United States</u>, 42 CIT __, 320 F. Supp. 3d 1341, 1344–48 (2018) ("<u>SolarWorld II</u>"); <u>SolarWorld III</u>, 355 F. Supp. 3d at 1309–14.

Trina challenged the <u>Final Results</u> on the grounds that, <u>inter alia</u>, Commerce's decision to use Thai import data to value Trina's nitrogen input was unsupported by substantial evidence because the data was aberrational and unreliable.   <u>See</u> <u>SolarWorld I</u>, 273 F. Supp. 3d at 1271–73.   The court disagreed and sustained Commerce's use of the Thai import data as a surrogate value for Trina's nitrogen input but remanded the <u>Final Results</u> on other grounds.  <u>Id.</u> at 1278–79.

After an additional remand on unrelated grounds, <u>see</u> <u>SolarWorld II</u>, 320 F. Supp. 3d at 1358, Commerce issued its <u>Second Remand Results</u>, which the court then sustained and entered judgment accordingly.  <u>See</u> <u>SolarWorld III</u>, 355 F. Supp. 3d at 1310; Judgement Order, Dec. 13, 2018, ECF No. 161.  Trina and Plaintiff SolarWorld Americas, Inc. ("SolarWorld") both appealed the court's judgment entered pursuant

to SolarWorld III.  See Notice of Appeal, Feb. 11, 2019, ECF No. 163; Notice of Appeal, Feb. 11, 2019, ECF No. 164.

On June 24, 2020, the Court of Appeals held, inter alia, that Commerce failed to adequately justify its use of Thai import data to value Trina's nitrogen input in Commerce's Final Results and vacated in part this court's judgment sustaining Commerce's final determination. See SolarWorld IV, 962 F.3d at 1356–59.  The Court of Appeals instructed Commerce to "either adequately explain why the Thai [Global Trade Atlas] data is not aberrational" or "adopt an alternative surrogate value for [Trina's] nitrogen input." Id. at 1358–59.  Pursuant to the Court of Appeals' decision in SolarWorld IV and the Court of Appeals' mandate pursuant to that order (see CAFC Mandate in Appeal, Aug. 17, 2020, ECF No. 175), the court remanded the case back to Commerce.  See Remand Order.

On remand, Commerce continues to use Thai import data to value Trina's nitrogen input.  Third Remand Results at 2.  Defendant argues that Commerce complied with the Court of Appeals' instructions and provides a sufficient explanation of its choice of Thai data and asks the court to sustain the Third Remand Results. See Def.'s Br. at 2.  Trina, Canadian Solar, and BYD, on the other hand, assert that Commerce's choice of Thai data is unreasonable in this case because the surrogate value is aberrational and Commerce's explanations for the difference between the AUV of imports into Thailand and the AUV of over 99% of the imports Commerce

reviewed are speculative and unsupported by record evidence.  <u>See</u> Trina's Br. at 2–3; CS-BYD Br. at 1–2.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction pursuant to section 516A of the Tarriff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping order. The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" <u>Xinjiamei Furniture (Zhangzhou) Co. v. United States</u>, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting <u>Nakornthai Strip Mill Public Co. v. United States</u>, 32 CIT 1272, 1274 (2008).

## DISCUSSION

Defendant argues that Commerce's <u>Third Remand Results</u> comply with the court's order in <u>SolarWorld IV</u> and sufficiently explain Commerce's choice of using Thailand's AUV data as the surrogate value for Trina's nitrogen input. See Def.'s Br. at 8–24.  Plaintiff asks the court to reject Commerce's use of Thai data to calculate the surrogate value for Trina's nitrogen input as unreasonable and unsupported by substantial evidence because Plaintiff alleges that the Thai data is aberrational and

Commerce has offered only speculation in response to the court's instruction to provide further explanation.  See Trina Br. at 3–19; CS-BYD Br. at 8–19.

When subject merchandise is exported from a nonmarket economy country, Commerce calculates normal value based on factors of production ("FOPs").  19 U.S.C. § 1677b(c)(1).  Commerce uses "the best available information" to value the FOPs, id., and has discretion to determine what constitutes the best available information.  QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  Commerce generally selects surrogate values that are publicly available, product specific, reflect a broad market average, and are contemporaneous with the POR.  Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014); see also Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at https://enforcement.trade.gov/policy/bull04-1.html (last visited July 22, 2021) ("Policy Bulletin 04.1").  Commerce's practice is to avoid using aberrational values as surrogate values.  See generally Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997).  Commerce further defines "aberrational" to mean an extreme outlier, distorted or misrepresentative, or somehow incorrect.  Tri Union Frozen Prods. v. United States, 41 CIT __, __, 227 F. Supp. 3d 1387, 1394-95 (2017).

In SolarWorld IV, the Court of Appeals addressed Commerce's use of a "bookend methodology" where Commerce accepted data as reliable and not

aberrational because it fell within the range of average import prices of the potential

surrogate countries.  962 F.3d at 1357.  The Court of Appeals rejected Commerce's

bookend methodology in those cases where specific evidence detracts from its use.  Id.

at 1357–58.  Specifically, the Court of Appeals noted that over 99% of the imports into

potential surrogate countries were for $0.13 or less/kg, while Thailand's imports,

which made up less than 1% of the imports reviewed, averaged over $11.00/kg. Id. at

1357-58.  The Court of Appeals further found that Commerce had not sufficiently

explained the discrepancy between the Thai data and the ITC data.  Id. at 1358–59.

Thus, on remand Commerce was required to provide an additional explanation for its

choice of Thai AUV data for the surrogate value for Plaintiff's nitrogen input beyond

its prior explanations rejected by the Court of Appeals.

Commerce's additional explanations in the Third Remand Results for its

continued reliance on Thailand for the surrogate value of Trina's nitrogen input are

unsupported by substantial evidence and unreasonable in light of the Court of

Appeals' decision in SolarWorld IV.  First, Commerce states that not only is the Thai

AUV within the range of potential surrogate countries, but also that the Thai AUV is

within the ranges of import prices in Bulgaria and Romania.  See Third Remand

Results at 6.  However, this reasoning suffers from the same defect as the Court of

Appeals found in Commerce's use of the "bookend" methodology. Although Commerce

looks at the range of individual prices for imports into certain potential surrogate

countries rather than only the range of average prices paid, it once again fails to

account for the discrepancy in the volume of imports at the low end of the spectrum versus the high end.  Just as Bulgaria and Romania account for over 99% of the imports into potential surrogate countries and Thailand, Ecuador, and Ukraine account for less than 1%, so too do the low-priced imports into Bulgaria and Romania account for over 99% of the imports into those individual countries while the high-priced imports account for less than 1%.  <u>See</u> Petitioner's Letter, "Submission of Publicly Available Factual Information to Rebut, Clarify or Correct," Oct. 29, 2015, Ex. 5B, Ex. 3, PDs 497–99, bar codes 3411020-01–03 ("Petitioner's SV Rebuttal Letter").  The Court of Appeals expressly found Commerce's failure to address this discrepancy to be unreasonable, yet on remand Commerce uses the same bookend methodology to justify its determination.  Commerce's explanation that the Thai AUV is within the ranges of the individual countries' imports is insufficient in light of <u>SolarWorld IV</u>.  The court cannot sustain Commerce's determination as reasonable on this record.  The Court of Appeals made clear that it is not reasonable to select a price that is consistent with a fraction of a percent of imports and thousands of percent higher than 99% of imports solely because at least one importer in similarly situated countries, under unknown circumstances, paid a higher price.  <u>SolarWorld IV</u>, 962 F.3d 1357-58; <u>see also</u> <u>Zhejiang DunAn Hetian Metal Co. v. United States</u>, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (stating that the court's duty is to "evaluate . . .

whether a reasonable mind could conclude that Commerce chose the best available information.").[5]

Next, Commerce attempts to differentiate the import data from Romania and Bulgaria from that of Thailand and argues that the Thai import data is actually more reliable. <u>Third Remand Results</u> at 7–8, 21–22. In support of this theory, Commerce notes that approximately 99% of the imports into Bulgaria and Romania come from neighboring countries, and concludes that there must be unique conditions that permit neighboring countries to import nitrogen at unusually low prices. <u>Id.</u> at 21. Specifically, Commerce states, "Hence, the overall AUV of imports of nitrogen into these countries may be more reflective of prices between certain suppliers (the suppliers in one or two exporting countries) and certain customers (the customers of those suppliers) and may not reflect the prices experienced by other customers in those markets." <u>Id.</u> at 7–8. Commerce further states that those lower prices are "[u]ndoubtedly due to lower transportation costs." <u>Id.</u> at 21.

---

[5] Defendant argues that requiring Commerce to implement a new practice to consider relative quantities of imports when determining whether an AUV is aberrational would impose an unbearable administrative burden on Commerce and lead to endless litigation and "cherry picking" of data. See Def.'s Br. at 14; Third Remand Results at 13. However, the Court of Appeals found that it is unreasonable to employ a bookend methodology and ignore a vast discrepancy in import quantity without explaining why that discrepancy coupled with an enormous difference in AUV does not render a primary surrogate country's data aberrational. <u>SolarWorld IV</u>, 962 F.3d at 1357–58. Therefore, Commerce was required to provide an additional explanation in this case. That Commerce found the imports into Thailand constitute a "commercial quantity" does not sufficiently explain why the AUV is not aberrational. <u>See</u> <u>Third Remand Results</u> at 27.

Commerce does not cite any record evidence that would permit it to make an inference that importers in Bulgaria and Romania receive special deals from suppliers in neighboring countries that are somehow unrepresentative of the nitrogen import market as a whole.  See id. at 7–8, 21–22.  Although Commerce cites to the record in support of its explanation, the document to which Commerce cites provides the volume and pricing of imports into the potential surrogate countries sorted by country of export, and does not contain any information about suppliers, consumers, or the contractual arrangements between them.  See id. at 7; Petitioner's SV Rebuttal Letter, Ex. 5B, PDs 497–99.  Commerce's conclusion that the lower prices of imports into Bulgaria and Romania from neighboring countries are due to special prices between buyers and sellers in those countries that are not reflective of the overall market is speculative, as is Commerce's explanation that the lower prices are "undoubtedly due to lower transportation costs."

Although it may be reasonable to infer transportation over shorter distances may cost less, there is no record evidence to support any conclusion that lower transportation costs account for the entirety of the lower cost or even that lower transportation costs account for a significant difference in the price of nitrogen.  In fact, the nitrogen imported into Thailand from the neighboring country of Malaysia does not support Commerce's explanation.  Petitioner's SV Rebuttal Letter, Ex. 5B, PDs 497–99.  Imports of nitrogen into Thailand from Malaysia were twice as expensive as those from Italy, for example.  Id.  The prices of imports into Thailand

Consol. Court No. 16-00134                                    Page 13

vary substantially and the differences cannot be explained by transportation costs based on distance. Id. Thus, Commerce's explanation that the vast majority of imports into Bulgaria and Romania are not reliable approximations of the market for nitrogen because those imports enjoy special pricing and lower transportation costs from neighboring countries is not supported by substantial evidence.

Commerce also suggests that the discrepancy between the price of the nitrogen imported into Thailand and the price of the nitrogen imported into Bulgaria and Romania can be explained by the fact that the nitrogen imported into Thailand was of unique "purity" necessary to construct solar cells. Third Remand Results at 23, 29. Commerce reasons that because there is evidence of Thai businesses engaged in the manufacture of solar cells (and no such evidence for Bulgaria or Romania), the price of nitrogen imports into Thailand is a more reliable indicator of the market price applicable to Canadian Solar. Id. at 23. However, Commerce itself admits that "There is no record evidence that Thailand imported an anomalous type, form, or purity of nitrogen during the POR." Id. at 20. Commerce does not cite any record evidence in support of the explanation that Thai data is more accurate because the nitrogen imported into Thailand is of the proper "purity" for solar cell production. See Id. 23, 29. Commerce's explanation that Thai data is not aberrational because nitrogen imported into Thailand is of the type and purity for use in the manufacture of solar cells is speculative and not supported by substantial evidence.

Lastly, Commerce's explanation for the discrepancy between Thai import data and ITC export data is speculative and unsupported by substantial evidence.  See id. at 13–15, 27–29.  The Court of Appeals found that Commerce's decision to rely on Thai import data instead of U.S. export data compiled by the ITC required further explanation because the two datasets "cannot both be correct."  SolarWorld IV, 962 F.3d at 1358.  On remand, Commerce asserts that the discrepancy could be due to a number of factors, including that transportation and insurance costs might be included in one set but not the other, time lags for when exports are shipped and imports enter the receiving country, delays at customs warehouses, and differences in reporting data from free trade zones.  Third Remand Results at 28.  However, although these discrepancies may explain minor differences, it is unreasonable to conclude that they reconcile the "admitted inconsistencies" noted by the Court of Appeals.  SolarWorld IV, 962 F.3d at 1358.  Moreover, none of Commerce's explanations is supported by record evidence, and Commerce does not cite to the record in support of its explanations.  Third Remand Results at 28.

Commerce fails to satisfactorily explain its continued reliance on Thailand's AUV for use as the surrogate value for Trina's nitrogen input.  Commerce did not sufficiently explain why the detracting evidence cited by the Court of Appeals does not render Thailand's AUV aberrational.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's redetermination of its surrogate value selection for valuing Trina's nitrogen input is remanded to the agency for reconsideration or further explanation consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand determination; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file a reply to comments on the remand determination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint Appendix; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of the filing of its remand determination.

 /s/ Claire R. Kelly 
Claire R. Kelly, Judge

Dated:      July 28, 2021
            New York, New York